PONDER, Justice.
 

 On April 12, 1935, Otho Elmer died leaving a last will and testament, in olographic form, bequeathing all of his property to his surviving wife, Viola Vendía Elmer, and naming her as executrix without bond. The deceased, Otho Elmer, is survived by six children — Charles O. Elmer, William H. Elmer, Elbert S. Elmer, Jacob O. Elmer, Mrs. Mary Elmer Gregory, and Mrs. Elizabeth Elmer McCall — issue of a previous marriage of the deceased, Otho Elmer, and Elizabeth South Cummings, deceased. On April 16, 1935, Charles Otho Elmer, one of the children of the deceased, sought to be appointed administrator and to have an inventory taken of all effects left by Otho Elmer. On April 22, 1935, Viola Vendía Schelin, surviving spouse of the deceased, presented the olographic will for probation in which she was designated as the executor and universal legatee. She asked for letters testamentary and that the order appointing a notary to take the inventory previously issued on the application of Charles Otho Elmer be vacated and recalled. The will was probated and the letters testamentary were issued to the surviving spouse. An inventory was then taken of the effects of the succession showing its assets to be of the value of $13,763.69. This inventory was homologated on May 27, 1935. The executrix filed a provisional account setting forth the amount of the inventory of $13,763.69 and the liabilities and debts of the succession in the amount of $6,578.68, leaving a net estate of $7,185.01 for distribution. An opposition was filed to this account by five of the six children claiming the inventory to be false and fraudulent. It was claimed in the opposition that the executrix had suppressed from the inventory the real estate belonging to the community, negotiable securities and movables that had been donated to the executrix by their deceased father, and that their deceased father, Otho Elmer, as executor of the succession of his first wife, Elizabeth Cummings, deceased, had suppressed assets in taking the inventory in that succession, and that the executrix of this succession should account for such suppressed assets. This opposition was supplemented by a supplemental opposition filed by all six of the children claiming that two pieces' of property acquired in the name of the executrix, Mrs. Viola Schelin, wife of Otho Elmer, was acquired during the' community and should be accounted for in f;he inventory and that they as forced heirs are entitled to their legal interest in the property. The property mentioned in the opposition is a lot and improvements on the corner of Carondelet street and Washington avenue and a lot and improvements
 
 *1021
 
 on Napoleon avenue. The Whitney National Bank of New Orleans also filed an opposition to the provisional account and the tableau of distribution. On October 13, 1935, the six children of the deceased instituted a suit against Mrs. Viola Schelin Elmer, individually ;and as testamentary executrix of the estate of Otho Elmer, seeking to have the will reduced to the disposable portion, to have the real estate undisposed of declared the property of the children, to have the acquisition of real and personal property before and after her marriage to the deceased set aside and annulled as fraudulent similations, to have the inventory filed in the succession of their mother, Elizabeth Cummings Elmer, set aside and annulled, and to have the inventory in this succession annulled and for an accounting of all the donations made by their deceased father to the executrix before and after their marriage. They further sought a judgment against the executrix individually and as executrix for whatever sum found due.
 

 In the plaintiffs’ petition it was alleged to the effect that their deceased father, Otho Elmer, while living happily with their deceased mother, Elizabeth Cummings, met the defendant, who was then the wife or widow of Edward J. Memory, and having become enamored with her, he left his home and took up his abode with the defendant; that several years before the death of their deceased mother their deceased father never stayed at home, but lived at various named places with the defendant in open concubinage; that their deceased father married the defendant ten days after the death of their deceased mother; that then their deceased father developed an unnatural and unfatherly hatred toward his children; that the hatred began at the inception of their deceased father’s infatuation for the defendant and because of the refusal of the children to recognize the defendant, which hatred caused their father to fraudulently and in collusion with the defendant to divert all his property into the name and possession of the defendant, before and after his marriage to her, and that the children have been deprived of their légitime in the succession of their father and mother; that their deceased father was not engaged in any business since 1917 and lived solely frOm the income of his property and investments since that date; that their deceased father was a prominent merchant, etc., and for many years before the date of their mother’s death, their father maintained, befitting his position, the matrimonial domicile and an establishment with the defendant at an expenditure of not less than $8,000 to $10,000 per annum; that during the existence of the community of their deceased father and their deceased mother the community possessed property to the value of $111,350; that the defendant never possessed property of any kind before her association with their deceased father and she had no means to invest; that the defendant acquired eight pieces of real estate, describing the real estate, after association with their deceased father, some before their marriage and some after their marriage; that the defendant had no funds of her own to effect these purchases and that the recitations in
 
 *1023
 
 the deeds that the property was purchased with her separate and paraphernal funds are false and untrue and were placed in the titles with the intent to defeat the children of their légitime in consequence of the hate their father held toward them; that their deceased father purchased and sold no real estate in his own name; that their deceased father, although possessed of a fortune exceeding $100,000,’in pursuance with his desire to confiscate the childrens’ legal rights, cáused the succession of their mother to be.opened and only inventoried the Louisiana avenue home appraised at $10,000, twenty shares of Whitney stock, appraised at $6,000, and household furniture appraised at $436.14; that the stock in the Whitney Bank was pledged for $5,-000 and a few months before the death of their mother he caused a mortgage to be placed on the home for $7,500, all of which real and personal property was caused to be sold by their deceased father to pay the debts which left a net estate in the community of only $10,004.98 when the same was valued in the excess of $100,000; that because of his hatred and animosity to his children he charged commissions as executor, the funeral expenses, the last months running expenses and for the flowers placed on their mother’s grave; that their father made a recitation upon the executor’s account that four of his children 'were indebted to the estate in an amount in excess of the amount due them and with the exception of $3,335 admitted to be due the other two children their father appropriated the entire community; that the executor’s account filed by their deceased father in their mother’s succession and the inventory therein is false, fraudulent and untrue, and a part and parcel of the scheme to deprive the children of their legal rights, and that it is in no wise binding upon the children; that notwithstanding the expressed friendship their father held for Jacob O. Elmer and the reiterated intention to protect Jacob O. Elmer in event of his death, that their father under the domination of the defendant denied J. O. Elmer his legal patrimony and that their father is additionally indebted to him in the sum of $663.38 as the result of a joint business adventure; that the purchases made by the defendant after her marriage to their deceased father being the property of the second community is indebted to the first community for the entire purchase price, and the defendant has no community whatsoever therein; that the" defendant is a rich woman and has assets of large value in the Whitney Banks, at her home, and elsewhere to which petitioners have no access; that all the assets of the defendant were derived from donations made by their father, both before and after his marriage-to the defendant, without consideration and are null and void; that the defendant should be made to account for these assets and pay the children their legal rights therein ; and that the will is null and void in so far as it impinges upon their légitime, which légitime is in excess of $100,000.
 

 The defendant answered denying the allegations of the petition and sets up that she bought the eight pieces of property with her separate and paraphernal funds. The defendant also avers in her answer that five of the children, naming them, acknowledged receipt of their part of their deceased
 
 *1025
 
 mother’s succession in a notarial act and agreed and consented to the discharge of the executor, their deceased father, and pleads estoppel.
 

 On the application of the children the court appointed Charles L. Seeman, a certified public accountant, to examine the records of the respective banks, covering the various transactions with these institutions by Otho Elmer and the defendant which was agreed to by the counsel for the defendant. On account of the report of the public accountant being so voluminous and the fact that the title to the property being so involved, requiring the taking of testimony of many witnesses, etc., the counsel for the children applied to the court to have the case referred to the commissioner.
 

 The defendant filed a plea of ten years’ prescription to the childrens’ claim of interest in their mother’s succession. The defendant filed a plea of res adjudicata to Elbert S. Elmer’s claim to interest in his mother’s succession, setting forth that Elbert S. Elmer had previously entered suit to that effect and judgment was rendered in the civil district court, division A, determining Elbert S. Elmer’s interest in the succession of his deceased mother on November 24, 1933.
 

 The case was tried and the commissioner recommended that judgment be rendered in favor of the defendant, the executrix, dismissing the opposition and dismissing the direct action. The opponents and the plaintiffs in the direct action filed an opposition to the commissioner’s report. Upon trial of this opposition the court rendered judgment in favor of the defendant both in her individual capacity and as executrix of the estate of Otho Elmer dismissing the opposition and supplemental opposition, overruling the defendant’s plea of prescription, sustaining the plea of res adjudicata as to the claim of Elbert S. Elmer in his deceased mother’s succession, dismissing plaintiffs’ direct action, and declaring the real estate to be the separate and paraphernal property of the defendant. From this judgment the plaintiffs and opponents have appealed.
 

 An examination of the record reveals that the inventory in the Succession of Mrs. Elizabeth Cummings Elmer corresponds with the auditor’s report in so far as cash and bank stock are concerned and the plaintiffs have not pointed out any property, real or personal, which they claim were suppressed or omitted from the inventory except the alleged donations to the defendant, Mrs. Viola Vendía Schelin Elmer. The only evidence to the contrary that we find as to the total value of the estate during the first community is a piece of envelope bearing some figures in the deceased’s handwriting. These figures are otherwise unidentified. If this were to be construed a calculation by the deceased of the value of the property of the first community, it shows that that community was worth around $80,000. The envelope bears the postmark of the date of October 11, 1892. We do not consider this evidence of much value. The testimony to the effect that the father was wealthy at the time he me,t the defendant is all in general statements without designating the items that constitute the wealth. The bulk of the testimony taken in this suit has reference to the question of concubinage.
 
 *1027
 
 Without going into a detail narration of the •testimony, we are convinced that the deceased and the defendant lived in concubinage from the year 1908 until the death of the deceased’s first wife, Mrs. Elizabeth Cummings Elmer, in 1922. The evidence shows that from 1908 to 1922 the defendant maintained the home of Mrs. Elizabeth Gummings in a style befitting her position in life. In fact, the evidence shows in so far as that maintenance was concerned he paid for the servants and all the comforts and conveniences. The plaintiffs themselves who testified in this case admitted that the deceased properly maintained the home and provided for the comforts and convenience of their deceased mother. One of the daughters, Mrs. Elizabeth McCall, one of the plaintiffs herein, being deserted by her husband returned to this family home with her three children. The other daughter, Mrs. Gregory, also one of the plaintiffs, having lost her husband in 1916, also returned-to, the family home bringing her four children with her. These daughters and their children lived with their mother until her death in 1922. The deceased fed and clothed the entire household and ‘provided for the education of his daughters’ children in private schools. Upon his first wife’s death he continued to support his two daughters contributing regularly the sum of $25 a week practically up to his death. The evidence shows and it ’is admitted by the plaintiffs that their deceased father made advances to them in the amount of $32,598.-96 prior to the death of their deceased mother and advances to them since the death of their' deceased mother to the amount of $.18,133.67. The deceased ceased being active in business in 1917. In 1922 when property of the community, between the deceased and his deceased wife, Mrs. Elizabeth Cummings, was sold under proceedings in the succession of Mrs. Elizabeth Cummings Elmer, it brought $26,964.39 and the liabilities amounted to $16,959.41 leaving *a net community estate of $10,004.98. The record shows that Mrs. Elizabeth Cummings Elmer left a will in which she bequeathed the usufruct of all her property to the deceased and named him as her executnr. The will contained no other dispositions. The deceased administered the estate and filed a final account in which he disclosed a net estate of $10,004.98 and calculated his community interest at $5,002.49 and fixing the interest of his six children at $833.75 each. After fixing these interests it is stated in the account: “But as Charles O. Elmer, Jacob O. Elmer, William H. Elmer and Elbert S. Elmer are indebted unto this estate in an amount in excess of the amounts due them herein, the executor proposes to pay said balance as follows: Otho Elmer (community interest) $6,669.98, Mrs. McCall $1667.50, Mrs. Gregory $1667.50.” This in effect is taking the shares of four of the children and dividing it one-half to himself and one-half to his two daughters, share and share alike. This account was homologated on June 29, 1923. In November, 1923, Elbert Elmer filed a rule in the succession proceedings alleging that the executor’s usufruct had been lost by his second marriage and that he should be paid his interest in this succession. There was judgment rendered in favor of Elbert S. Elmer for $833.-75, which judgment was compromised and settled. In December, 1933, Mrs. Mary
 
 *1029
 
 Elmer Gregory, Mrs. Elizabeth McCall, Elbert S. Elmer, Jacob Otho Elmer, and William H. Elmer signed an acknowledgment before a notary public acknowledging that they were fully cognizant of the contents and acknowledging having received $833.75 each as per final account and consenting to the discharge of the executor. As to Charles O. Elmer, he admits having overdrawn his account while in business with his father in 1917 over $18,000 and that the amount has never been paid. The plaintiffs deny having been paid their interest in their mother’s succession. However that might be, the record shows that the plaintiffs were indebted to their deceased father in an amount considerably more than he owed them. In the record kept by the deceased of the advances made to his children in a book bearing date September 1, 1932, there were entries of a partial record of the payments and money he had advanced to his children. The deceased did not have himself discharged as testamentary executor of his deceased wife’s estate and technically this estate has never been closed. However, the children acquiesced in the allocation of the money paid them and have never made any request or demand otherwise until these proceedings were filed. Even though we were to concede that the plea of res adjudicata did not apply as to Elbert S. Elmer or that the heirs who signed the receipt of settlement in their mother’s succession were not estopped, yet the evidence in this case goes to show that the amount designated, $833.75, was the correct amount of their interest in their mother’s succession. .The evidence indicates that at one time the deceased was well-to-do. But the evidence does not show what the deceased was worth at the time he met the defendant. The defendant testified that when she married Memory in 1900 she had jewelry worth approximately $12,000; that .she inherited $300 and some furniture from her mother’s estate in 1905; and that in 1906 at the time she left her husband, Memory, he gave her $1,600 cash and furniture which she sold in 1908 for $1,000. She also testified that her husband contributed $15 per week to her support for about a year. After leaving her husband she rented a house on South Claiborne avenue where she took in roomers and boarders. She testified that she had four rooms for rent for which she charged $120 per month for couples and $65 per month for singles, but kept no books and had no idea what her profit was. ,
 

 On May 26, 1908, the defendant acquired, her first piece of real estate which is referred to as the Carondelet street property. This property was purchased in her sister’s name for the sum of $5,705, paying $1,905 cash and the balance represented in three notes. She testified that the cash payment came from money given her by her husband, E. J. Memory, money received for the sale of the furniture, and money received from her mother. She testified that the reason she placed this property in the name of her sister was.because she was not at that time separate in property from her husband, Edward J. Memory. This property was not acquired from the deceased. We do not find any evidence that contradicts this, testimony of the defendant. There is nothing in the record to show that she obtained the amount of the
 
 *1031
 
 cash payment from the deceased. The defendant testified that she lived in this place for a' short while in 1908 and rented it during the years 1909 and 1910 for $70 per month and then returned to the place in 1912. She testified that her gross income from her roomers and boarders was approximately $700 per month and from that amount she paid off the mortgage representing the balance due of the purchase price. Her testimony as to the ownership of the property is corroborated by the auditor’s report wherein it is shown that she deposited in her saving account $70 a month from February, 1910, through September 30, 1910. This corroborates her testimony as to the rentals received. The property was sold on September 5, 1912, for $5,900; the cash payment being $1,966.64. The auditor’s report shows that on September 12th the defendant made a deposit of $1,807.84. Prior to 1908 the defendant had - a saving account with the Commercial Germania Bank which was closed in the year 1908, but it is agreed that the bank’s detail record is not available. The defendant’s testimony to the effect that she placed this property in the name of her sister appears to be reasonable, for at that time she was not separate in property from her husband. We find no testimony to show that any donations were made by the deceased prior to that time. On January 13, 1915, the defendant obtained judgment against her husband, Edward J. Memory, of separation of property.
 

 On January 25, 1915, the defendant acquired her second piece of property on St. Mary street for $6,950, paying a cash payment of $2,316.67 and the balance being represented by notes. She testified that she began negotiations for- this property in January, 1913, and gave her real estate agent, a Mr. Parkinson, one-third of the down payment, but- owing to a defect in the title she did not acquire the property until January, 1915. She testified that she sold the furniture from the Carondelet street place on September 25, 1912, for $366.45. The auditor’s report shows that she deposited this amount in the bank on that date. She testified that it was the amount of the proceeds of the sale of this furniture and the cash received in the sale of the Carondelet St. place of $1,807.84 which was used as the down payment of the St. Mary street property. She testified that she gave her real estate agent $1,400 on January 14, 1913/ $650 on February 13th, and $116 on April 15th as representing the down payment. The auditor’s report shows a withdrawal of those amounts on v those dates. The aggregate withdrawal amounted to $2,166 or $150.67 less than the, down payment called for in the deed. She testified that the balance of the purchase price represented by notes was paid from the proceeds of the notes of the sale of the Carondelet street property. These notes amounted in principal to $3,933.36. This shows a discrepancy to the amount of $699.97. From her testimony she received an income from boarders and from the sale from time to time of pieces of jewelry and had funds in a safe. There is no evidence that contradicts this testimony. There is no evidence that she obtained any funds from the de
 
 *1033
 
 ceased husband to make this down payment. However, the auditor’s report shows that on December, 1914, the deceased withdrew from his bank account the sum of $700, and on January 25, 1915, he made another withdrawal of $1,625. The plaintiffs contend that these withdrawals were used for the down payment of the St. Mary property. The only evidence we. have is that the withdrawals were made on that date. We have no evidence to show for what purpose the withdrawals were made. The plaintiffs contend that on account of the withdrawals in an amount near and similar to the down payment and on a date near the date of purchase we should construe that it was the money used for the down payment of the purchase price. If we were to concede that the plaintiffs were correct in this contention, it could not avail plaintiffs. It was only a part of the total purchase price and could only at the most be considered to that extent. If it was a donation it would be a donation in the amount of $2,325. If this amount was returned to the gross estate of the deceased, it could not affect the amount bequeathed the defendant for the reason that the amount bequeathed to the defendant is considerably less than the disposable portion of the gross estate, after all donations have been fictitiously returned to the estate.
 

 On December 26, 1916, the defendant acquired her third piece of property, referred to as the Iberville street property, for $2,250 paying $2,000 cash and $250 represented in notes. The defendant’s testimony as to the funds used to make the down payment on this property is not at all satisfactory, yet there is nothing in the record to show that she obtained it from the deceased, and the deceased’s bank account does not show any withdrawal of such sum during the month of December, 1916. Under this evidence we could not be justified in determining that the funds were derived from the deceased.
 

 The fourth piece of real estate acquired by the defendant known as the Le Page street property was acquired on March 14, 1918, for the price of $7,500, the cash payment being $7,025 and the balance represented in a note payable one year from date. The defendant testified that she had borrowed $5,300 from her real estate agent, Mr. Parkinson, on her unsecured note, and that in March, 1918, she rented the St. Mary street property to a fraternity for one year for $1,380 which was paid in advance. She testified that she deposited in the bank to her saving account on March 6, 1918, $1,281.15 of the amount she received from the fraternity for rent of the property. The auditor’s report shows that a deposit of that amount was made on that date to her account. She testified that on the date she purchased this Le Page street property she withdrew $1,-700 from her bank account which together with the $5,300 borrowed from Parkinson was sued to make the down payment on this property. The auditor’s report shows that she made a withdrawal from the bank of $1,700. Upon examination of the auditor’s report with reference to the deceased’s bank account during the month of December of that year, we find that the largest withdrawal was only $75. There is nothing to show that this transaction
 
 *1035
 
 was in any way connected with the deceased.
 

 On July 17, 1919, the defendant sold the St. Mary street property for $8,500 cash. She testified that out of the proceeds she paid Parkinson the $5,300 and banked the rest. The auditor’s report shows that on the day after the sale she deposited $3,383.42. The auditor’s report does not connect in any manner this transaction with the bank transactions of the deceased. There is no evidence in the record that contradicts the testimony of the defendant in this respect.
 

 The defendant acquired twenty-five shares of Whitney Bank stock on July 22, 1919. She testified she paid $3,830 cash and gave a note for the balance $4,445 secured by the stock. The auditor’s report shows that the defendant withdrew $3,830 from her savings account on that date. The canceled note was filed in evidence and shows that payments were made on the note at different intervals until April 6, 1920, at which date the last payment on the note was made. ‘
 

 On. September 4, 1919, the defendant sold the Iberville street property for $3,000 cash. She testified that on September 5, 1919, she made a payment on the bank stock note of $2,651.59 from the amount received from the sale of this property. The bank stock note shows a payment of that amount of that date.
 

 The defendant sold the Le Page property on August 5, 1930, for $13,000 cash. We find that she deposited on that date $12,-073.73.
 

 On September 13, 1920, the defendant bought the Carrollton avenue property for $11,500 cash, withdrawing from her saving account $1,150 on August 16, 1920 and the balance $10,450 on September 13th, the day of the sale. The auditor’s report shows these withdrawals on those dates. The auditor’s report shows that the deposits made from the Le Page Street property remained intact until the withdrawals for the purchase price of this property. The defendant is corroborated by the auditor’s report. There, is no evidence to the contrary.
 

 On October 20, 1922, the defendant sold the Carrollton avenue property for $17,000 cash. She testified of making deposits of the amount in the bank. Her testimony as to these deposits is corroborated by the auditor’s report. This property was purchased prior to the marriage of the defendant to the deceased on September 6, 1922, but was sold after her marriage to the deceased. The funds were deposited in her separate account and under her separate control and thereby remained her separate and paraphernal funds. On February 24, 1923, the defendant, then being the wife of the deceased, acquired the property on Carondelet and Washington avenue for $17,-500 cash. The deed recited that it was purchased with her separate and paraphernal funds and her husband appeared therein acknowledging that fact. The defendant testified that she withdrew from her bank account $1,750 on February 6th as the first payment and $15,750 on the date the deed was passed to pay for the property. The auditor’s report shows that the withdrawals
 
 *1037
 
 were made on those dates from the defendant’s separate bank account. $17,000 of this amount came from the sale of the Carroll-ton avenue property which the auditor’s report shows remained in her account intact until used to buy this property with the other funds on deposit in the defendant’s account. The defendant still owns this property.
 

 On May 8, 1923, the defendant bought the St. Charles avenue property for $15,-500, paying $5,500 cash and the balance of $12,000 represented in a note. This note was pledged to the Whitney Bank as will be seen by the auditor’s report and the defendant presumably turned over the cash to the vendor. On the date that this property was purchased the defendant borrowed $4,000 from the Whitney Bank, pledging twenty shares of her bank stock, and deposited this amount in her bank account. The defendant’s testimony to this effect is corroborated by the auditor’s report. The defendant testified that when she agreed to purchase the property she paid down $1,750 •cash on April 23, 1923. The auditor’s report shows that she had a balance in her .separate account on that date of $1,750. The defendant testified that the date the ■deed was passed to the property she withdrew from her bank account $3,750, which together with the first payment completed the cash payment of $5,500. She is corroborated by the auditor’s report. At that date she had on deposit, having borrowed :$4,000 from the bank, the amount $4,848.93 which is also corroborated by the auditor’s report.
 

 On September ’5,’ 1928, the defendant exchanged the St. Charles avenue property to Dr. Frick for the Napoleon avenue property, by two acts of sale and exchange. The defendant’s St. Charles avenue property was valued at $35,000, and Dr. Frick’s Napoleon avenue property at $19,000, making a difference in defendant’s favor of $16,000. Dr. Frick paid the defendant $4,-000 cash and on September 8, 1928, paid the Whitney Bank the $12,000 which the defendant owed, thereby canceling and releasing the mortgage against the St. Charles avenue property. From the evidence it clearly shows that the Napoleon avenue property is the separate property of the defendant.
 

 She now owns the property which is her separate property and the property on Washington avenue and Carondelet street which the evidence shows is her separate, property. Therefore, this property forms no part of the community existing between the defendant and the deceased. Throughout these various transactions the defendant maintained her separate bank .account and kept her funds separate and apart from that of her deceased husband. In all the transactions subsequent to her marriage the deeds recite that, the various pieces of property were purchased with her separate and paraphernal funds. From a close analysis of the auditor’s report we cannot find anything therein that connects any of the deceased’s funds with these transactions. All of this property was acquired from persons other than the deceased and no property was acquired from the deceased. From
 
 *1039
 
 the evidence as to all of these transactions, the auditor’s report, the profits received from the sale of the property from time to time, accounts for the funds used in purchasing of other property. We find no evidence to the contrary. The plaintiffs seem to rely on the broad statement that their father was wealthy when he first met the defendant and continued to grow poorer and that the defendant was poor and continued to grow wealthy to prove that their father systematically transferred his property to the defendant in order to defeat the plaintiffs of their rights. The plaintiffs do not point out any specific transfer and have produced no evidence to show any specific transfer of'property, personal or real, from the deceased to the defendant.
 

 The evidence shows that the deceased ad- , vanced to his six children prior to the death of their deceased mother the total amount of $32,598.96 and that the deceased advanced to plaintiffs since the death of their deceased mother and since the marriage of the defendant ■ to the deceased the total amount of $18,133.67. Under the provisions of article 1493 of the Revised Civil Code the disposable portion where there are six children cannot exceed one-third of the estate.
 

 In order to determine whether or not the disposition in the will to the defendant encroached upon the légitime of the plaintiffs as being in excess of the disposable portion it is necessary to determine the aggregate amount of the estate. Article 1505 of the Revised Civil Code reads:
 

 “To determine the reduction to which the donations, either inter vivos or mortis causa are liable, an aggregateds formed of all the property belonging to the donor or testator at the time of his decease; to .that is fictitiously added the property disposed of by donation inter vivos, according to its value at the time of the donor’s decease, in the state in which it was at the period of the donation. The sums due by the estate are deducted from this aggregate amount, and the disposable quantum is calculated on the balance, taking into consideration the number of heirs and their qualities of ascendant or descendant, so as to regulate their legitimate portion by the rules above established.”
 

 The method of arriving at the aggregate under article 1505 was discussed in the cases of Succession of Moore, 40 La.Ann. 531, 4 So. 460; Succession of Desina, 123 La. 468, 49 So. 23; and in Guidry v. Caire, 181 La. 895; 160 So. 622. According to article 1505 of the Civil Code and the above-cited cases, the donations made by the deceased would have to be fictitiously returned to the estate, then the debts of the succession would have to be deducted, and from the amount left after deducting the debts the disposable portion would be determined. The inventory of the estate was $13,763.69, and adding the donations to the plaintiffs during the second community in amount of $18,133.67 it would make $31,897.36. After deducting the debts of the estate $6,578.68 it. would leave a community estate in the-amount of $25,318.68. The deceased’s half interest in this community estate would be-$12,659.34, and adding the donations or cash advances prior to the second marriage' in the amount of $32,598.96 it would make $45,258.30. From this amount deduct the
 
 *1041
 
 payment of the plaintiffs’ share of their mother’s estate in the amount of $5,002.49 which would make the estate of the. deceased in the amount of $40,255.81. The disposable portion, one-third of this estate, would be $13,418.60, an amount considerably more than the disposition herein to the defendant. If we were to assume that the entire estate at the death of the deceased was a community estate, the disposition would not encroach upon the légitime for the reason that half of the estate would belong to the defendant in her own right and on this basis the bequest would only be in the amount of $3,592.50. In either event the disposition would not encroach upon the légitime of the plaintiffs.
 

 The counsel for the plaintiffs urges that under the provisions of article 1481 of the Revised Civil Code that any donation made to a concubine is absolutely null. Article 1481 reads:
 

 “Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it can not exceed one-tenth part of the whole value of their estate. Those who afterwards marry are excepted from this rule.”
 

 We have already determined that there was no donation made to the deceased prior to their marriage; the only donation made to the deceased being that made in the will at which time the defendant was the wife of the deceased.
 

 For the reasons assigned the judgment of the lower court is affirmed, at appellants’ cost.
 

 O’NIELL, C. J., does not take part.